04-20379.o2

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

Case No. 04-20379 CIV MORENO

JUAN VELAZQUEZ,

    Plaintiff,

vs.

CITY OF HIALEAH etc.,

    Defendants.
_____/

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

**This matter** is before this court on Defendants Kelvin Orlando Bostic, Barbaro Hernandez and Sergeant Theresa Pearce's ("Officer Defendants") Motion for Summary Judgment, Defendants City Officials' (Mayor Raul L. Martinez and Chief of Police Rolando D. Bolanos) Motion for Summary Judgment, and Defendant City of Hialeah's ("City") Motion for Summary Judgment, all filed May 24, 2004. The Court has reviewed the Motions, Responses and Replies, and the entire record in this matter. In addition, a hearing was held before the Honorable Barry S. Garber on July 14, 2004, and the Court adopts the transcript of that hearing by reference herein.

The counts of Plaintiff's Complaint which have survived the motion to dismiss allege the following violations: Count I ( 42 U.S.C. §1983 as to Defendant City), Count II ( 42 U.S.C. §1983 - Mayor Martinez), Count III (42 U.S.C. §1983 - Police Chief Bolanos), Count IV (42 U.S.C. §1983 -Defendant Bostic), Count V (42 U.S.C. §1983 - Defendant Hernandez), Count VI (42 U.S.C. §1983 - Defendant Pearce)[1], Count XIII (Conspiracy to Violate Civil Rights - Defendants Bostic, Hernandez & Pearce), Count XIV (Negligent Hiring - Defendant City), Count XV (Negligent

---

[1] Plaintiff's counsel conceded at the hearing that Defendant Pearce is entitled to summary judgment on this count.

1

Retention - Defendant City). The Defendants move for summary judgment on each count, respectively.

The Court being otherwise fully advised, **FINDS** as follows:

## FACTS

It is undisputed that on the night of February 18, 2000, shortly before midnight, Plaintiff was driving in a company car when he was stopped by Officer Bostic. Plaintiff had just left the Outback Steak House, where he had consumed a beer.

Officer Bostic testified that he stopped Plaintiff's vehicle because he observed Plaintiff speeding and failing to stop at a flashing red light, and then had to follow him for several blocks before Plaintiff pulled over. Plaintiff denies these offenses and states that when he realized Officer Bostic was following him he pulled over immediately. Bostic Aff. ¶¶ 6-7. Communication log notes indicate that the stop was reported to dispatch at 12:15 a.m. on the 19th, and that at 12:15:05 a.m., Officer Bostic called dispatch to run a check on Plaintiff's tag, and stated that he was calling Officer Hernandez. Fadel Aff. p. 14.

Plaintiff exited his vehicle and walked back to Officer Bostic's vehicle.[2] Officer Bostic got out of his vehicle, obtained Plaintiff's drivers license and ran a records check which reported "no history." Officer Bostic testified that Plaintiff was "very nervous" with a strong odor of alcohol on his breath, bloodshot watery eyes, slurred speech, and a white powdery substance in his right and left nostrils. Ex. I., Bostic Aff. ¶ 8. Officer Bostic began to administer a series of roadside sobriety tests to Plaintiff.[3]

At 12:17 a.m., Officer Hernandez radioed Officer Bostic to ask if he needed backup, and Officer Bostic replied "[U]h yeah, subject's a little edgy - might get into something." Fadel Aff. p.

---

[2]Plaintiff testified that he believed Officer Bostic was signaling for him to come over.

[3]Plaintiff testified that as soon as Officer Bostic exited his vehicle, he removed the keys from Plaintiff's vehicle.

2

14. Officer Hernandez arrived at the scene at 12:26 a.m., after Officer Bostic had administered the first series of tests, at which time Officer Bostic ordered Plaintiff to submit to additional tests. What happened next is in dispute.

**Plaintiff's Version**

Plaintiff testified that he performed the first set of tests without any mistakes or loss of balance, and that upon completion, Officer Bostic unbuckled and unsecured his service weapon from his holster strap, then searched Plaintiff's car but found no contraband. Plaintiff states that when Officer Bostic ordered him to perform additional roadside exercises after Officer Hernandez had arrived, Plaintiff "informed BOSTIC that this constituted harassment and that he, VELAZQUEZ, knew his rights," to which Bostic replied "[Y]ou're going to do what the f ... I tell you to do." Plf. Ex. 2. Plaintiff stated that he informed Officer Bostic that he was not going to do anything further.

Plaintiff further testified that while he was waiting at Officer Hernandez' car, Officer Bostic went back to search his car again, and that every time he attempted to look at Officer Bostic, Officer Hernandez kept shining his flashlight in his eyes. Plaintiff states that he kept asking Officer Hernandez whether he was under arrest, and Hernandez responded "don't worry about it" several times, and believing that he was not under arrest, Plaintiff turned and started to walk back to his vehicle because his trunk was open. According to Plaintiff, the following then occurred. Officer Hernandez shoved him and he fell back, and Officer Bostic jumped on him and started to choke him, and bit him in the shoulder area. Plaintiff "went down to the ground and was handcuffed without any violent resistance toward either BOSTIC or HERNANDEZ." After being cuffed he was repeatedly beaten by both Bostic and Hernandez "while on the ground and defenseless." and he was eventually struck in the facial area with a "hard blunt object." Plf. Ex. 2. While he began to lose consciousness, he was grabbed by the head and pepper sprayed in the eyes and face.

Plaintiff additionally testified that when Defendant Sergeant Pearce arrived and when he begged her for help, she "put her foot on his face and turned his head side-to-side, while calling him a "mother f ...."

**Officers' Version**

Officer Bostic testified that when he requested that Plaintiff perform the first series of sobriety tests, Plaintiff claimed he had consumed three beers, was "nervous and agitated whining that he was afraid that he was going to fail the sobriety test and was going to be taken to jail if he agreed to take the tests." He further stated that Plaintiff "continuously moved closer to me, and I had to reposition myself several times to keep him away from the gun side of my body." Bostic Aff. ¶9.

Officer Bostic further testified that after Officer Hernandez arrived Plaintiff attempted but failed to perform additional sobriety exercises. Officer Bostic decided to arrest Plaintiff for DUI, based on this failure as well as Plaintiff's driving pattern and the "white powdery substance" in Plaintiff's nostrils. Officer Bostic instructed Plaintiff to stand with his hands on Officer Hernandez' car, and went to retrieve the keys from Plaintiff's vehicle, at which time he heard Officer Hernandez yell for help. When he turned, he saw a baggie of cocaine on the ground, and another falling from Plaintiff's pants leg, and Officer Hernandez trying to grab them while trying to prevent Plaintiff from kicking them away. Bostic Aff. ¶¶11-14.

Officer Hernandez testified that at the time he arrived, Plaintiff "had a strong odor of alcoholic beverages on his breath, his eyes were blood shot, he had a white powder substance in both nostrils, and his speech was slurred," and was uncooperative. He further testified that while Plaintiff was standing at the front of his vehicle, he observed Plaintiff shaking his pants leg while looking down at his feet, and then two baggies of white powder dropped from his pants leg. As Plaintiff went down to grab the baggies, Officer Hernandez ran up and grabbed him and Plaintiff began to punch and kick him. Officer Bostic came over and attempted to control Plaintiff. Hernandez Aff. ¶¶ 5-7.

Officer Hernandez further stated that when he attempted to radio for emergency back up, Plaintiff knocked the radio out of his hand, and he had to abandon Officer Bostic momentarily to retrieve it. Hernandez Aff. ¶ 8. At 12:32 a.m., Officer Hernandez advised over his radio that he was in trouble, and emergency units were dispatched to the scene. Fadel Aff. ¶16. Officer Hernandez

4

further states that when he returned to Officer Bostic and Plaintiff, Plaintiff knocked the radio out of his hands for a second time, and Plaintiff reached for Officer Bostic's gun, at which time Officer Bostic said that Plaintiff "was going for his gun." Hernandez Aff. ¶ 10. Officer Hernandez states that Plaintiff was difficult to control because of his size and strength, and neither officer was able to force Plaintiff to release his grip on the gun. Officer Hernandez withdrew his asp and when Plaintiff refused a verbal order to release the gun, he struck Plaintiff on the left arm and left side of his body but Plaintiff still refused to release the gun and they all fell to the ground. Officer Hernandez resorted to pepper spray in an attempt to handcuff Plaintiff. Hernandez Aff. ¶¶ 12-13. While the struggle was ongoing, Detective Bello arrived and assisted the officers in getting the second cuff on Plaintiff. The officers deny striking Plaintiff after he was cuffed, but maintain that he continued to struggle and yell. Def. S of F ¶¶ 15-16.

**Post Arrest Treatment**

Fire Rescue arrived at the scene at 12:41 a.m.. The rescue notes indicate that Plaintiff denied loss of consciousness and reported pain all over, and vitals were taken and minor lacerations and bleeding to the face were observed and treated. Def. Ex. S.

Plaintiff was transferred to Ward-D at Jackson Memorial Hospital. Plaintiff testified that at Ward-D one of the officers stated "This one is ours" and Plaintiff was handcuffed to a bench "where he suffered from the agonizing pain and lack of attention at the insistence of the [sic] BOSTIC and HERNANDEZ," was denied access to the bathroom and forced to urinate on himself. Plf. Ex. 2. Plaintiff further states that he advised Officer Hernandez that he "desperately needed medical attention" but that the officers left, and that he did not receive any medical attention at Ward D.

Officer Hernandez testified that while at Ward D, Plaintiff was not handcuffed, and he was provided with water. Hernandez Aff. ¶ 16. Officer Bostic stated that Plaintiff was examined by a nurse or doctor while he and Officer Hernandez completed their paperwork. When Plaintiff had medical clearance, the officers transported Plaintiff to the Dade County Jail. Bostic Aff. ¶ 22.

Ward D records show that Plaintiff was signed in at 1:45, went into triage at 1:55, and he was

released at 3:00. Def. Ex. W. The record contains a photograph of Plaintiff at Ward D, where he is depicted sitting on a bench, not handcuffed, and drinking a cup of water. Def. Ex. X.

**Plaintiff's Convictions**

On July 15, 2003, Plaintiff was convicted of the felonies of depriving Officer Hernandez of his radio and attempting to deprive Officer Bostic of his weapon, and the misdemeanor lesser included offenses of battery on Officer Hernandez, and resisting, obstructing or opposing Officer Hernandez. Def. Ex. GG.

**Investigation/Policies**

Officers Bostic and Hernandez participated in a re-enactment of the use of force for the Medical Examiner's Office. The report indicates that the officers' versions of the struggle is more consistent with the medical and physical evidence. Def. Ex. DD.

At all times material, the Hialeah Police Department had policies in force and effect requiring appropriate training and supervision of police officers, adherence to all legal standards in effecting arrests and using force, and proving or investigation of complaints of police misconduct. During the tenure of Rolando Bolanos as Police Chief, allegations of misconduct were investigated, when deemed appropriate, disciplinary action was taken and, where deemed warranted, criminal charges were filed against officers irrespective of rank.   Chief's Aff. pp. 3- 9.

Chief Bolanos reviewed the Internal Affairs documentation relating to the use of force against Plaintiff, including the Preliminary Complaint Report, and determined that there was sufficient credible evidence that the officers resorted to a level of force that was appropriate to stop the threat and to protect themselves and others. Chief's Aff. ¶ 9.

Beginning in 1999, the Chief instituted a policy of aggressive DUI enforcement to reduce the number of crash-related fatalities. Def. Ex. KK. On November 2, 1999, Captain Beyer authored an e-mail which indicated that he wanted to raise the level of DUI arrests from an average of 1 per shift per month to 1 per officer per month and he stated that any officer with less than 1 DUI arrest per

6

month is to be "verbally counseled and closely monitored."[4] Def. Ex. F. On January 5, 2000, Captain Beyer authored another e-mail admonishing that too many DUI arrests were being dropped because Breathalyzer tests indicated insufficient blood alcohol levels to establish intoxication. He admonished that all arrests required probable cause and that he was commencing updated training on sobriety testing to correct the problem. Def. Ex. G. It was subsequently determined that officers had been arresting drivers high on drugs, not alcohol, which breathalyzer tests could not detect. Officers were sent to drug recognition school so that drug offenders arrested based on field sobriety tests which provided the officers' probable cause for arrest could be confirmed by the D.O. technicians. Def. Ex. KK.

**Mayor Martinez**

On June 30, 1999, prior to Plaintiff's arrest, Defendant Mayor was involved in an altercation with a person during a protest on the Palmetto Expressway, in which the Hialeah Police were also involved (the "Mirabal incident.). A lawsuit filed by this person against the Mayor and the City was dismissed.

## DISCUSSION

The purpose of summary judgment is "to pierce the pleadings and assess the proof in order to see whether there is a genuine need for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56 advisory committee's note). Summary judgment is proper only when no genuine issue as to any material fact exists and the moving party is entitled to a judgment as a matter of law. Info. Sys. & Networks Corp. v. City of Atlanta, 281 F.3d 1220, 1224 (11th Cir. 2002).

The moving party bears the initial burden of explaining to the Court the basis for the motion

---

[4]Captain Beyer did not have authority to set policy. Verbal counseling and monitoring are not forms of administrative sanction under civil service rules, and do not result in any adverse employment actions against the officer. Def. Ex. KK.

7

and identifying those portions of the record that demonstrate that there is no genuine issue of material fact. United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir. 1991). Thus the movant must either show that the nonmoving party has no evidence to support its case, or present "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." Id. at 1438; Young v. City of Augusta, 59 F.3d 1160, 1170 (11th Cir. 1995). But the Court must view all of the evidence in the light most favorable to the nonmoving party, with all reasonable inferences also being drawn in the nonmovant's favor. Info. Sys.& Networks, 281 F.3d at 1224; Four Parcels of Real Prop., 941 F.2d at 1437. If the movant is able to demonstrate either of the aforementioned requirements, the burden shifts to the nonmoving party to show that a genuine issue remains for trial. Id. at 1438.

A genuine issue as to material fact exists only when "a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. Id. at 247. An issue of fact is material if it "might affect the outcome of the suit under the governing law." Id. at 248. Where a reasonable fact finder may "draw more than one inference from the facts, and that inference creates a general issue of material fact, then the court should refuse to grant summary judgment." Barfield v. Brierton, 883 F.2d 923, 933-34 (11th Cir. 1989). However, if the facts and inferences overwhelmingly favor one side, such that a reasonable jury could only arrive at one verdict, then summary judgment must be granted as a matter of law. Williams v. Dresser Indus., Inc., 120 F.3d 1163, 1167 (11th Cir. 1997).

### I. Counts IV, V and VI/Officer Defendants - §1983

Plaintiff alleges that the Officer Defendants violated 42 U.S.C. § 1983,[5] based on claims

---

[5]That statute states, in pertinent part:

> **§1983. Civil Action for deprivation of rights**

under the Fourth, Fifth, Eighth and Fourteenth Amendments. Defendant Officers argue that Plaintiff's constitutional rights were not violated, but even if they were, that they are protected under the doctrine of qualified immunity.[6] The Court's analysis therefore is two-fold. First, the Court must determine whether, taking the facts in the light most favorable to Plaintiff, a reasonable jury could conclude that a constitutional violation occurred. If so, then the Court must determine whether qualified immunity applies.

### A.     Underlying Constitutional Violation

In order to prevail on a §1983 claim, a plaintiff must show violation of a constitutionally protected liberty or property interest and deliberate indifference to that constitutional right. Rivas v. Freeman, 940 F.2d 1491, 1496 (11th Cir. 1991).

### 1. Fifth Amendment

Plaintiff claims that his Fifth Amendment due process rights were violated by denial of medical treatment and by keeping Plaintiff "chained to a bench where he was forced to urinate on himself." The Due Process Clause of the Fifth Amendment requires the Government to provide medical care to persons injured during apprehension by the police. Costoso v. United States, 884

---

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory of the District of Columbia subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...

42 U.S.C. § 1983.

[6]Qualified immunity protects government officials who perform discretionary governmental functions from civil liability in their individual capacity so long as their conduct does not violate any "clearly established statutory constitutional rights of which a reasonable person would have known." Rowe v. City of Ft. Lauderdale, 279 F.3d 1271, 1280 (11th Cir. 2002) (citing Harlowe v. Fitzgerald, 457 U.S. 800, 818 (1982)).

F. Supp. 52, 57 (D.P.R. 1995).[7] Plaintiff has failed to present any substantive evidence which creates an issue of fact as to the Defendant Officers' liability for denial of medical treatment. The Officer Defendants testified that Plaintiff was treated by Fire Rescue at the scene. The notes from Fire Rescue indicate that Plaintiff was indeed given treatment by Fire Rescue, which took his vital signs, noted lacerations and contusions, and treated them. Plaintiff's self-serving testimony to the contrary is not substantive evidence.[8]

With respect to the lack of treatment at Ward D, it is uncontroverted that he was taken there for medical clearance and released. Even if the court accepts as true Plaintiff's statement that the Officer Defendants said "This one is ours," this does not mean, as Plaintiff suggests, that this was a command not to treat him, or that any failure to treat Plaintiff was caused by the officer's statement. Moreover, mere negligence in diagnosing or treating a medical condition is not a constitutional violation. Estelle v. Gamble, 429 U.S. 97, 106 (1976); see also Hill v. Dekalb Regional Youth Detention Center, 40 F.3d 1176, 1186 (11th Cir. 1994). Rather, in order to state a colorful constitutional claim for denial of medical care, a plaintiff must allege (1) a serious medical need and (2) acts or omissions sufficiently harmful to evidence deliberate indifference to that need. Estelle, 429 U.S. at 104; Hill, 40 F.3d at 1186. Plaintiff has failed to established the existence of a serious medical need. To be a serious medical need under the deliberate indifference standard, the condition must be diagnosed by a physician as mandating treatment or one that even a lay person would recognize as needing a doctor's attention. Hill, 40 F.3d at 1187. Plaintiff does not state what medical treatment he was entitled to at Ward D and did not receive, in light of the fact that he was

---

[7] Because the Eighth Amendment's protection does not attach until after conviction and sentence, Plaintiff's claims for denial of medical attention will be analyzed under the Fifth Amendment. See Ingraham v. Wright, 430 U.S. 651, 671 n. 40 (1977).

[8] The Eleventh Circuit has stated: "The strength of evidence does not necessarily depend on the number of witnesses who testify, but the number is a legitimate consideration among other things, such as whether the single witness in opposition is an interested party." Woodard v. Fanboy, L.L.C., 298 F.3d 1261, 1267 n. 9 (11th Cir. 2004).

treated by Fire Rescue, other than claiming that he was in "shock," and that he urinated on himself because he was not taken to the bathroom. Plf. depo p. 162.[9]

2. Fourth Amendment

Plaintiff's Fourth Amendment claim raises two possible grounds - illegal stop and seizure, and excessive use of force.

a. Illegal Stop, Search and Seizure

When an officer stops an individual and restrains his or her freedom to leave, a seizure has occurred, triggering the Fourth Amendment's protections against unreasonable seizures. Brown v. Texas, 443 U.S. 47 (1979). Defendant claims that he was illegally arrested because he did not commit any offense, that his arrest was illegal because there was no probable cause to believe he had committed that offense, and that the resulting searches were illegal.

Defendants argue that Plaintiff is precluded from raising these claims herein under the Rooker-Feldman doctrine, which the Eleventh Circuit has explained as follows:

> Under the *Rooker-Feldman* doctrine, the authority to review final decisions from the highest court of the state is reserved to the Supreme Court of the United States. *See Hollins v. Wessel*, 819 F.2d 1073, 1074 (11th Cir. 1987). Federal district courts may not exercise jurisdiction to decide federal issues which are inextricably intertwined with a state court's judgment. *Blue Cross and Blue Shield of Maryland, Inc. v. Weiner*, 868 F.2d 1550, 1554 (11th Cir. 1989). A district court engages in impermissible appellate review when it entertains a claim that the litigants did not argue in the state court, but is inextricably intertwined with the state court judgment. *Feldman*, 460 U.S. at 483 n. 16, 103 S. Ct. at 1316 n. 16. The *Rooker-Feldman* doctrine applies as long as the party had a reasonable opportunity to raise his federal claims in the state court proceedings. *Wood v. Orange County*, 715 F.2d 1543, 1547 (11th Cir. 1983). If the party had no reasonable opportunity, this court considers "that the federal claim was not 'inextricably intertwined' with the state court's judgment." *Powell v. Powell*, 80 F.3d 464, 467 (11th Cir. 1996).

---

[9] With respect to the claim that he was chained to a bench, the record contains a photograph of Plaintiff showing that he was not chained to a bench, but to the extent that this creates an issue of fact, the evidence presented by Plaintiff fails to create a material issue of fact with respect to failure to administer medical treatment or "cruel and unusual punishment."

Dale v. Moore, 121 F.3d 624, 626 (11th Cir. 1997).

In addition to the charges on which Plaintiff was convicted, Plaintiff was charged with possession of cocaine and marijuana in the state proceeding. The validity of the stop and the arrest, which led to the discovery of that evidence, was therefore relevant and Plaintiff could have litigated those issues before the state court, by way of a motion to suppress evidence. The Court finds that the issue to be "inextricably intertwined" with the state court's judgment, and therefore barred by the Rooker-Feldman doctrine.

  b. Excessive Force

In Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1248 (11th Cir. 2004), the Eleventh Circuit made clear that the Fourth Amendment "encompasses the right to be free from the use of excessive force in the course of an investigatory stop, or other 'seizure of the person.'" See also Graham v. Connor, 490 U.S. 386 (1989) ("all claims that law enforcement officers have used excessive force - deadly or not - in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach [under the Fourteenth Amendment].") The reasonableness inquiry is "whether the officer's actions are 'objectively reasonable' in light of the facts and circumstances confronting him, without regard to his underlying intent or motivation." Kesinger, 381 F.3d at 1248.

Defendants argue that Plaintiff is precluded under the doctrine of collateral estoppel from litigating the issue of excessive force, based on the offenses for which he was convicted. The Defendants are correct that in light of the convictions, it appears that the Officers' attempts to subdue him were not excessive. However, the Plaintiff has testified that the officers continued to beat him

after he was handcuffed. As the Court noted in Vazquez v. Metropolitan Dade County, 968 F.2d 1101 (11th Cir. 1992), in order for collateral estoppel to apply, the fact must have been necessarily decided in the first proceeding. Although the degree of force used by the Officer Defendants and the justification therefore in response to Plaintiff's proven actions against the Officer Defendants (i.e., attempting to take the gun, interfering with the radio and resisting arrest) were necessarily decided in the first trial, what happened to Plaintiff after he was subdued was not. See Vazquez, 968 F.2d at 1108 ("The fact that the act to which the police responded was a criminal act does not foreclose the possibility that the officers' response also was illegal"). Because issues of fact remain as to the officers' actions after the handcuffing, summary judgment is inappropriate, both on the claim itself (as to actions following the handcuffing), and the Officers' claim of qualified immunity.

Defendants rely upon the medical examiner's report, in which the examiner found that Plaintiff's injuries were "more consistent" with the Officer Defendants' version of the events (that is, that they were all suffered in an attempt to handcuff Plaintiff, rather than as Plaintiff maintains, after the arrest). However, this merely creates an issue of fact which must be resolved by the jury. The Court finds inapposite the case law relied on by Defendants concerning the "doctrine of incontrovertible physical facts," which generally stands for the proposition that testimony will be rejected as a matter of law when it conflicts with physical facts so clearly established that they cannot be erroneous," see, e.g., Ernst v. Ace Motor Sales, Inc., 550 F. Supp. 1220 (E.D. Pa. 1982). "Incontrovertible facts are those which would make a different version of the accident literally impossible." Id. at 1224. Although the physical evidence of injuries on Plaintiff's body may have been, in the medical examiner's opinion, "more consistent" with the officers' versions of events, this does not rise to the level of creating "incontrovertible facts." Even in light of the medical examiner's

opinion, Plaintiff's version of the events after the handcuffing took place is not "literally impossible."

## II. Count XIII (Conspiracy to Violate Civil Rights - Officer Defendants)

In order to prove this Count, Plaintiff must show "(1) a violation of [Plaintiff's] federal rights, (2) an agreement among the Defendants to violate such a right, and (3) an actionable wrong." Geidel v. City of Brandenton Beach, 56 F. Supp. 2d 1359, 1367 (M. D. Fla. 1999). The Court has determined that the only viable constitutional claim Plaintiff has raised is excessive force. Even assuming that Officers Bostic and Hernandez did use excessive force, there is no evidence of an agreement between the officers to do so.

Defendant argues that Defendant Pearce's participation in the conspiracy was a "cover up," as evidenced by her failure to completely and accurately document the event when she performed her investigation at the scene. According to Plaintiff, Department policy required Sergeant Pearce to interview the Plaintiff, as well as the officers, and to photograph Plaintiff's injuries, but she did not do so. Defendant Pearce testified that she did not interview Plaintiff because he was unruly and out of control. Plaintiff states that an issue of fact is created by the testimony of Officer Infonte, who testified that at the time that Sergeant Pearce arrived, Plaintiff was basically a "bloody pulp," and that there were other civilians there whom Sgt. Pearce did not interview. Defendant argues that because Sgt. Infonte was not disclosed by Plaintiff, his criminal testimony cannot be considered, based on prior rulings of Judge Garber.

The Court finds that even if this evidence were to be considered, it fails to create an issue of fact. With respect to Sgt. Pearce's failure to interview Plaintiff, Plaintiff himself testified that following the incident he was "incoherent" and couldn't carry on an intelligent conversation. Plf.

depo at 145-47. Moreover, the Court disagrees with Plaintiff's argument that Sgt. Pearce's failure to perform a complete investigation is circumstantial evidence that "she must have spoke[n] to the officers which she directly supervised and obviously tried to bend over backwards to cover up possibly an excessive force in this case." Trans. p. 41. There is no evidence of any agreement between Sgt. Pearce and the Officer Defendants, and Plaintiff's supposition that there "must have been" one is insufficient.

### III. Counts I, II, III (42 U.S.C. §1983/Defendant City, Mayor Martinez, Chief Bolanos)

A. Municipal Liability

The Supreme Court established the standards for municipal liability under §1983 in Monell v. Dept. of Social Services, 436 U.S. 658 (1978), in which the Court held that "it is when execution of a government policy or customs, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under §1983." Id. at 694. In order to impose §1983 liability on a municipality, Plaintiff must show "(1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." McDowell v. Brown, No. 04-10272, 2004 WL 2809309 (11th Cir. Nov. 8, 2004) (citing City of Canton v. Harris, 489 U.S. 378, 388 (1989)).

Where the "policy" involved is an alleged failure to train, the Court has required that "[a]t the very least there must be an affirmative link between the policy and the particular constitutional violation alleged." City of Oklahoma City v. Tuttle, 471 U.S. 808, 822 (1985). Furthermore, "the identified deficiency must be closely related to the ultimate injury." Canton, 498 U.S. at 391. Although a single violation does not amount to an official policy or custom resulting in the

deprivation of an individual's constitutional rights, "a single constitutional violation may result in municipal liability where there is sufficient independent proof that the moving force of the violation was the municipal policy or custom." Vineyard v. County of Murray, Ga., 990 F.2d 1207, 1212 (11th Cir. 1993) (citing Gilmere v. City of Atlanta, 774 F.2d 1495, 1504 n. 10 (11th Cir. 1985)).

In order to prove supervisory liability, Plaintiff must show either that "the supervisor personally participate[d] in the alleged constitutional violation or [that] ... there is a causal connection between the actions of the supervising official and the alleged constitutional violation." Gonzalez v. Reno, 325 F.3d 1228, 1234 (11th Cir. 2003). To establish the second prong, Plaintiff must show either (1) "a history of widespread abuse that puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so, Id. at 1234 (quoting Braddy v. Fla. Dept. of Labor & Employment Sect'y, 133 F.3d 797, 802 (11th Cir. 1998)) or (2) that "the supervisor's improper 'custom or policy ... resulted in deliberate indifference to constitutional rights,'" (quoting Rivas v. Freeman, 940 F.2d 1491, 1495 (11th Cir. 1991) or (3) "facts which support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." Gonzalez, 325 F.3d at 1235 (citing Post v. City of Ft. Lauderdale, 7 F.3d 1552, 1561 (11th Cir. 1991)).

B. Plaintiff's claims

Plaintiff's initial basis of municipal liability was based on the City's alleged policy of "aggressive DUI enforcement." In order for a custom or policy to provide the basis for liability, that custom or policy must have been the "moving force" behind the constitutional violation. Plaintiff has shown no connection between that policy, assuming it existed, and the alleged excessive force. The fact that Plaintiff may have been initially stopped pursuant to that policy is too far attenuated

from Plaintiff's remaining cause of action to provide a basis for municipal liability.

With respect to his remaining theory, in the hearing before Judge Garber, Plaintiff's counsel stated that "this case is a little bit different" from the reported cases on municipal liability, and conceded that he was "unable to find any cases really that are ready [sic] specific or fact specific as this case." He described Plaintiff's theory as follows:

> Essentially what we are saying is that through their conduct the mayor and the chief, and thereby the municipality, through their conduct and repeated incidents of law violation, of public lying, of misconduct, they have set an environment within the city of Hialeah and with specific regard to the use of force, with regard to the mayor's incident, they have set a custom and a matter of condoning excessive use of force and sent a message to their police officers by these public displays that, "this stuff is going to be okay. And if you use excessive force we'll cover you and we'll take care of the problem."

At the hearing on this motion, Judge Garber found that the incident involving Defendant Mayor and Mr. Mirabal is irrelevant to the issues in this case, and this Court agrees. Other than that incident, the only other involvement Plaintiff alleges on the part of the Mayor and the Chief, is that the Chief "consulted" with the Mayor concerning the "aggressive DUI" enforcement, and the conclusory allegations that the Chief failed to supervise and/or train his officers. These allegations are insufficient to establish the direct involvement necessary to support supervisory liability for an alleged constitutional violation.

Plaintiff additionally argues that there was a policy in the City of inadequate investigation of excessive use of force complaints, citing the following testimony of the Defendant Chief:

> We're going to look at all of the information, and unless we find a discrepancy that is not supported, or I should say, unless - if- unless we find a discrepancy that is supported by fact from the witness or the victim or the complainant, we're going to decide that there is no basis for further investigation, and the reason for that is because people are quick to make excessive use of force complaints and people believe that - some people believe that the police have

17

absolutely no authority or should have no authority to hit them.

Bolanos depo. p. 114. Plaintiff has failed to provide any evidence that this policy is somehow deficient, such that the use of this policy was a moving force behind an excessive force violation. In sum, the Court finds that Plaintiff has failed to raise an issue of fact as to liability of the City, Chief Balanos or the Mayor. Accordingly, the Court finds that Defendant City, Defendant Mayor, Defendant Chief are entitled to summary judgment as to the §1983 counts.

### IV. Count IV - Count XIV and XV - Negligent Hiring and Negligent Retention (City)

Under Florida law, hiring and retention of police officers are immune discretionary, as opposed to operational, activities. Maybin v. Thompson, 514 So. 2d 1129, 1130 (Fla. 2d DCA 1987); see also Borges v. City of West Palm Beach, No. 93-8373, 1994 WL 397301, *7 (S.D. Fla. 1994). Moreover, Plaintiff has presented absolutely no evidence that the City was negligent in hiring officers involved in police misconduct. Section 768.096 of the Florida Statues establishes a presumption against negligence in hiring where the employer undertakes the requisite background investigation. In this case, the Chief's affidavit (¶6) asserts that all the conditions of the requisite background investigation have been met, and Plaintiff has presented no evidence to the contrary. Similarly, Plaintiff has presented no evidence that the City was negligent in its retention of its officers. Accordingly, the City is entitled to summary judgment on counts XIV and XV.

Based on the foregoing, it is hereby **ORDERED AND ADJUDGED** as follows:

1. Defendants Kelvin Orlando Bostic, Barbaro Hernandez and Sergeant Theresa Pearce's ("Officer Defendants") Motion for Summary Judgment is **DENIED** with respect to Defendants Bostic and Hernandez as to Counts I and II, only on the claim of excessive force after the handcuffing. The motion is **GRANTED** in all other respects as to those Defendants, and

**GRANTED** as to Defendant Pearce;

    2.    Defendants City Officials' Motion for Summary Judgment is hereby **GRANTED**;

    3.    Defendant City of Hialeah's Motion for Summary Judgment is hereby **GRANTED**.

**DONE AND ORDERED** this 7th day of Febuary, 2005, at Miami, Florida.

STEPHEN T. BROWN
U.S. MAGISTRATE JUDGE

cc:    Federico A. Moreno
       Christienne H. Sherouse, Esq.
       Santiago Lavandera, Esq.
       Nelson T. Pena, Esq.
       William M. Grodnick, Esq.